Filed 6/21/13  P. v. Bonner CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057350 |
| v. | (Super.Ct.No. RIF1105377) |
| WILLIAM CHARLES BONNER, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jeffrey Prevost, Judge.

Affirmed.

Melanie K. Dorian, under appointment by the Court of Appeal, for Defendant and

Appellant.

No appearance for Plaintiff and Respondent.

1

**INTRODUCTION**

On January 3, 2012, an information charged defendant and appellant William Charles Bonner with owning or operating a chop shop under Vehicle Code section 10801 (count 1), and receiving stolen property under Penal Code section 496d, subdivision (a) (count 2).

On July 27, 2012, a jury found defendant guilty on count 2, but could not reach a verdict as to count 1. The trial court declared a mistrial as to count 1 and, ultimately, dismissed it.

On September 21, 2012, after denying without prejudice defendant's motion to reduce count 2 to a misdemeanor, the court suspended imposition of sentence and placed defendant on formal probation for 36 months, with terms and conditions. The trial court ordered that defendant serve 60 days in home detention and imposed a number of fines and fees, including victim restitution.

On October 19, 2012, defendant filed a timely notice of appeal.

**STATEMENT OF FACTS**

*I. Prosecution Case*

The victim lived in an apartment in Riverside. On October 3, 2011, he arrived home around 9:00 a.m. and parked his 2002 Chevrolet Silverado pickup truck in his assigned space. The following morning, around 7:30 a.m., he noticed his truck was gone. After checking with a local security towing company to verify they had not mistakenly

2

towed his truck, he called the police and reported the truck missing. The victim did not give permission to anyone to take his truck.

Miguel Garcia, an auto theft investigator with the Riverside County Auto Theft Task Force, a multi-agency task force, testified that on October 12, 2011, shortly after 3:00 p.m., he received a dispatch call regarding a possible "chop shop."[1] An anonymous caller had reported seeing a newer vehicle, which had been cut into pieces, on a property located on Mazie Street, near Highway 74 in Perris.

Garcia and three other investigating officers went to the location. The reported address did not exist; however, Garcia was able to see another property in the same general area, on Highway 74. Garcia observed a large object, which he believed to be a portion of a vehicle, loaded onto a trailer and covered with a tarp. The investigators entered the property through an unlocked gate, and Garcia knocked on the front door. There was no answer.

Garcia believed the item in the trailer was either a front radiator or grill of a truck. This made Garcia believe this was the property the anonymous caller had reported as a chop shop. To confirm his suspicion, Garcia and the other detectives remained in the area and conducted surveillance of the property to see if anyone would arrive at the location.

---

[1] "Chop shop" refers to the process of removing parts of stolen vehicles and selling them for scrap.

About an hour to an hour and a half later, a white Dodge Ram pulled onto the property. The detectives went back to the property, and Garcia again knocked on the front door. Defendant answered the door. Defendant confirmed that this was his residence and the Dodge Ram was his truck. He was very cooperative. Garcia informed defendant about the reported chop shop, and requested permission to search the property for any stolen vehicles, vehicle components, or any paperwork for stolen vehicles.

Defendant signed a consent form and authorized the detectives to search his property. He walked alongside the detectives; the detectives searched the entire property, including inside the residence. Garcia testified that defendant was walking slowly with the investigators, but he was not using a cane. According to Garcia, defendant walked around the property pretty easily.

Garcia first checked the object he had seen covered with the tarp. When he removed the tarp, he saw a portion of a truck. The bed of the truck was missing, and the steering column had been removed. Garcia also noticed that the vehicle identification number (VIN) and license plates were missing, and the ignition had been damaged. Garcia testified that in order to determine whether a vehicle is stolen, he would need to first find the secondary VIN number on the vehicle, which is usually in a hidden place, and then run that number in a database to retrieve the true identity of the vehicle.

Garcia testified that he did in fact verify that the vehicle was the victim's missing truck. Defendant eventually admitted that even though he had noticed the missing VIN

4

plate and the damaged ignition, he had overlooked this information because he simply wanted to make some money.

Garcia continued to search the property and found numerous items, including a gas tank that appeared to belong to a large vehicle, tools in the garage, a trash can containing what appeared to be the headliner of a vehicle, and a portion of an interior of a vehicle. Garcia also discovered two rims and tires in the back of defendant's Dodge Ram.

Garcia asked defendant about the stolen truck. Initially, defendant told Garcia that he saw the truck several days before while he was driving home after leaving a friend's house. Defendant said the vehicle was in the same condition as Garcia had found it on defendant's property. Defendant said the parts were already missing, the doors had been removed, and defendant thought it was an abandoned vehicle. Defendant decided to drive back to the area to get the vehicle. He brought it back to his house and was going to try to sell the parts and metal.

Upon further questioning, defendant admitted that the gas tank on his property and the tires in his Dodge Ram were from the stolen truck. He also told Garcia that he had removed the bed and doors of the truck. Defendant told Garcia that he had sold the bed of the truck for $150, and had sold the doors to an unknown person. Defendant did not recall how much he received for the doors.

During the interview, defendant mentioned that he was disabled. This prompted Garcia to ask whether anyone had assisted him in bringing the truck back to his property.

5

Defendant then responded that his friend, "Anthony," told him about the truck, and helped him load and bring the vehicle back to his property. Defendant also said that he and Anthony had split the $150 they had received for selling the bed of the truck. Defendant stated that he did not know his friend Anthony's last name. Garcia later confirmed that Anthony's last name was Ruelas.

Garcia testified that removing parts from an abandoned vehicle and selling them was not illegal. Rather, he stated that chop shop violations occur when the vehicle involved is a stolen vehicle. Based on defendant's statements and the fact that the truck was stolen, Garcia arrested defendant and transported him to the police station.

A neighbor of both defendant and Ruelas testified that he was not friends with defendant but considered him to be a "very polite gentleman." He further testified that on or about October 12, 2011, Garcia came to his house looking for Ruelas regarding a "missing car."

When Garcia mentioned the car, the neighbor asked the detective whether his investigation involved a Chevy Silverado pickup truck. The neighbor told Garcia that he had seen Ruelas driving the Silverado on October 6, 2011. The neighbor stated that Ruelas drove a quad and was known to borrow cars from people. However, the neighbor found it unusual to see Ruelas driving the Silverado because it was hard to believe that anyone would loan Ruelas such a vehicle. The neighbor further testified that he had seen the same truck in pieces on defendant's property.

6

Eventually, Garcia arrested Ruelas at defendant's house, and Ruelas pleaded guilty to running a chop shop.

Workers at a recycling center in Perris testified that defendant and Ruelas would occasionally bring scrap metal to the center for recycling. In October 2011, Ruelas tried to sell a Chevy truck to one of the workers. That worker testified that the truck was in "good condition" and was a "whole truck." However, Ruelas could not provide proof of ownership or any paperwork for the truck, so he was turned away. Ruelas said he would return with the proper documents, but he never did.

*II. Defense Case*

Defendant testified that he is 72 years old, receives social security and pension benefits, and suffers from numerous medical conditions. He further testified that he has had surgery on both shoulders four times, and has been using a cane for walking since 1976.

Defendant met Ruelas in 2011; they had mutual friends. At one point, Ruelas asked defendant if he could move in with him. Defendant did not ask for Ruelas's last name, but wanted to know if Ruelas had a criminal record. Ruelas assured defendant that he did not, and defendant allowed Ruelas to move in on the condition that he obtain a job.

Ruelas told defendant that he was unable to find a job, but he could do recycling for money. Ruelas asked defendant if he could borrow his truck for his recycling; defendant refused. Eventually, the two agreed that defendant would drive and Ruelas would collect any scrap metal they found. They collected items for recycling three or

7

four times a week. They got paid by the weight of the items and always split the money equally between them.

A week prior to defendant's arrest, Ruelas told defendant about a truck he had found in the hills. Ruelas asked defendant for assistance in bringing the truck onto defendant's property. That evening, around 7:00 p.m., defendant picked up Ruelas and his trailer, and the two of them went to retrieve the truck. When they arrived, there was no one else around.

Defendant walked toward the driver's side of the truck. The door was open. Looking from outside the truck, he noticed that the dashboard was "tore up," and the stereo was "sitting where the speedometer was." Otherwise, all parts, including the bed, were intact, and the truck appeared to be in good condition. Defendant did not recall whether there was a front grill.

Defendant further testified that he did not know if the truck was able to start. He also did not notice whether the license plates were missing; he said that he was not paying attention. Defendant also testified that he has a background in mechanics, although he had no formal training. He knew that a VIN plate appeared on the driver's side, but did not consider looking for the plate on the truck. The possibility that the truck may have been stolen did not cross his mind, as there were always abandoned vehicles in that area. This was not the first time defendant had seen one.

8

Defendant testified that Ruelas loaded the truck onto his trailer, and they drove the truck back to defendant's house. The following morning, defendant found the bed of the truck cut off and placed on the trailer. The back tires and wheels had also been removed.

Ruelas and defendant discussed recycling the parts of the truck. The next day, they took the bed of the truck to the recycling center. Ruelas received $150 for the bed, which he split with defendant.

The following day, defendant and Ruelas returned to the recycling center to sell the cab. Defendant exited his vehicle and waited for Ruelas, who went to speak with one of the workers. After speaking briefly with the worker, Ruelas returned and said that they would not accept the cab because Ruelas did not have the proper paperwork. Defendant asked Ruelas where the paperwork was. Ruelas hesitated for a few minutes, and then admitted that the truck was stolen.

Defendant became angry and told Ruelas he did not want the truck or the cab on his property. Defendant also asked Ruelas why the recycling center would accept the bed, but not the cab. Ruelas did not respond. Ruelas told defendant he knew a friend who would take the cab. The two drove by this person's house, but Ruelas said the friend was not home.

Defendant testified that he drove home, dropped off the trailer, and drove to an appointment at the social security office. Defendant had not been receiving his benefits and needed to attend the appointment in order to resolve the issue. He testified that he

9

did not think about calling the police. When he left his home at 2:30 p.m., there was no tarp over the cab of the truck, and Ruelas had already left defendant's house.

Defendant arrived back home around 5:30 or 6:00 p.m. When he pulled up, he saw a tarp over the cab. Defendant was inside his home, when Garcia knocked on his front door. Garcia asked defendant's for his name. When defendant asked why, Garcia said he had received a report regarding a stolen vehicle.

Garcia asked defendant, "'Do you know a person named Anthony [Ruelas],'" and defendant answered, "'I don't know. I just know a person that's Anthony.'" Garcia then asked permission to search defendant's home and property. Defendant testified that he did not change his story, as Garcia had earlier testified. He specifically denied the statement about selling the doors, and insisted that he had no idea how or when the doors had been removed. Defendant also denied telling Garcia that he had noticed the missing VIN plate, but had overlooked it.

Defendant further testified that as he was being arrested, Ruelas "came by on his quad and he saw the sheriffs and he went flying out across the fields and stuff." After defendant's arrest and while in custody, defendant identified Ruelas in a photograph Garcia had shown him. About a week after defendant was released, Ruelas knocked on defendant's front door and asked him, "'What happened?'" Defendant knew Garcia was in the area, watching his property, so he did not contact the police. About 10 to 15 minutes later, Garcia showed up at defendant's house and arrested Ruelas.

## ANALYSIS

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738, setting forth a statement of the case, a summary of the facts and potential arguable issues, and requesting this court to undertake a review of the entire record.

We offered defendant an opportunity to file a personal supplemental brief, but he has not done so. Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have conducted an independent review of the record and find no arguable issues.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

J.

We concur:

RAMIREZ

P. J.

CODRINGTON

J.

11